# Staunton

NICHOLAS M. CORDOVANA AND MARGARET B. CORDOVANA v. AMAND C. VIPOND AND SHIRLEY W. VIPOND.

September 4, 1956.

Record No. 4503.

Present, All the Justices.

The opinion states the case.

*James A. Murphy, Jr. (John B. James, W. Griffith Purcell,* on brief), for the appellants.

*William C. Worthington (Worthington & White,* on brief), for the appellees.

WHITTLE, J., delivered the opinion of the court.

The Cordovanas, complainants in the court below and appellants here, filed a bill against the Viponds, respondents in the court below and appellees here, praying for a mandatory injunction to require the Viponds to remove a fence which denied the Cordovanas "their riparian rights".

The bill recites that the Cordovanas own lot 5, Site C, Cromwell Farm, and that the Viponds own the adjoining lot, No. 6, in the subdivision.

The Viponds filed an answer and cross-bill. The answer conceded that the fence had been erected by them, "on their land", but denied that it interfered with any rights to which complainants were entitled. The part of the cross-bill with which we are concerned prayed that the court establish the true boundary line between lots 5 and 6.

The case was submitted to the court upon the pleadings, a stipulation and exhibits. The stipulation reads:

"The petitioners (Cordovanas) were owners of Lot Five (5) and the respondents (Viponds) were owners of Lot Six (6), Site C, Cromwell Farm, as shown on the plat entitled Subdivision of Site C, Cromwell Farm, * * * . The fence as shown on the plat entitled 'Topographic Survey of Lot Six (6), Site C, Cromwell Farm, * * * ' was erected by the respondents, * * * . This stipulation with the exhibits mentioned herein and with the pleading is all the evidence."

The exhibits are as follows:

(1) Deed dated January 2, 1951, from Masters and wife to the Cordovanas, conveying lot 5 on the plat entitled "Subdivision Site C, Cromwell Farm", made in January, 1930, and recorded in Map Book 8, page 24, in the clerk's office of the Corporation Court of the City of Norfolk, "together with all riparian rights, waterways, water rights, and appurtenances in any wise belonging or appertaining thereto." The deed refers to the plat for a description of the lot conveyed.

(2) Deed dated November 25, 1953, from Stant and wife to the Viponds, conveying lot 6, Site C, Cromwell Farm, as shown on the plat mentioned in (1) above and recorded as there indicated. The deed recites "the exact location, description and dimensions of the said property being shown and controlled by the aforesaid plat."

(3) Map (complainants' exhibit) showing the subdivision of Site C, Cromwell Farm, which includes lots 5 and 6. The map shows that both lots face on "South Blake Road", which partly bisects a peninsula jutting southwardly into Lafayette river. The northern line of lot 5 as shown on the map starts at a point on South Blake road where the dividing line between lots 4 and 5 intersects the eastern boundary of said road; thence north 88 degrees east 185 feet to a point in the river. The eastern line of lot 5 begins at the last mentioned point and runs below the high water mark in said river south 26 degrees 00 minutes east an undesignated distance to a point in the river. The southern line of lot 5, which is the line here in controversy, begins at a point in South Blake road where the dividing line between lots 5 and 6 intersects the eastern boundary of said road and runs north 80 degrees 30 minutes east a distance of 120 feet to a point in said river designated by the high water mark line. Lot 5 faces 128.3 feet on South Blake road.

The exhibit discloses that lot 6 is located at the southern end of South Blake road and includes the entire southern end of the peninsula. The northern boundary of lot 6 is the dividing line between lots 5 and 6, which is the line here in dispute. According to the map this line begins at a point in the eastern end of South Blake road and runs north 80 degrees 30 minutes east 120 feet to the high water mark. This latter line, together with 30 feet (the width of the road) and 143 feet along the dividing line between lots 6 and 7 which begins at a point in the western end of South Blake road and runs south 18 degrees west 143 feet, forms the northern boundary of lot 6. The eastern, southern, and western portions of lot 6 are designated on the map by the high water line extending around the lot.

(4) Topographic survey of lot 6 (respondents' exhibit), showing both lots 5 and 6 as indicated in (3) above. In addition it shows the general topography of the land and shows the fence erected by respondents approximately 6 or 8 inches on their side of the dividing line between the lots. The dividing line on the survey is extended in a straight line north 80 degrees 30 minutes east 360 feet from the point on South Blake road. The survey shows the projected line extending approximately 100 feet beyond the low water mark in the river to that part of the river reserved in the subdivision map ((3) above) for the boat basin.

Upon the evidence submitted, the court entered a decree holding that "the parties hereto are two coterminous owners of riparian

lands", and, over the objection of the Cordovanas decreed "that the true boundary line between lots 5 and 6, Site C, Cromwell Farm, designated on the map aforesaid, is established as being 80 degrees 30 minutes east, a distance of 360 feet, more or less, from the western end of the dividing line between lots 5 and 6, to a point in the Lafayette river which is distant 230 feet, more or less, south 26 degrees 00 minutes east from a point on the eastern end of the line, dividing lots 3 and 4 as shown on the last mentioned plat. And there being nothing further to be done in this cause it is ordered that the same be stricken from the docket."

To the entry of this decree we granted the Cordovanas an appeal.

The assignments of error stressed in argument before us asserted that the decree was not responsive to the pleadings, and did not decide the issues presented; and that "the supposed line fixed is totally erroneous and cuts the plaintiffs' riparian lot off from the water."

The Cordovanas assert that the primary object of their bill was to have the court require the Viponds to remove the fence which destroyed the riparian rights to which they were lawfully entitled. Apparently the decree ignores the prayer of the bill as the fence is nowhere mentioned therein. It, however, complies with the prayer of the cross-bill and fixes the dividing line between lots 5 and 6.

The Cordovanas contend, as aforesaid, that the dividing line shown on the Viponds' topographic survey and adopted by the court entirely "land-locks lot 5 and destroys their riparian rights". The Viponds concede in their brief that "it is true * * * that every riparian owner has the right to the water frontage belonging to his land, including the right of access to the navigable part of the river apportioned according to the amount of shore line he may own, as established by the evidence of the navigable line of the water course." They contend, however, that "here, the plaintiffs (the Cordovanas) have not introduced a shred of evidence as to where the navigable line is, what its length or contour is, * * *."

It will be remembered that the court, by its decree, found "that the parties hereto are two coterminous owners of riparian lands". This finding and the establishment of the dividing line in issue was evidently determined by the court from the evidence before it. Thus the lack of evidence complained of applies with equal force to the claims of both parties.

Manifestly the court based its decision upon the pleadings and exhibits which the stipulation states constitute "all the evidence" in the

case. The map exhibits show the winding, irregular course of the Lafayette river. They also show the Cordovanas' lot bordering on the river; and further show lines plainly designating the high and low water marks, and that portion of the river reserved by the subdividers for a "boat basin".

■ It is conceded by the Viponds that the court erroneously extended the dividing line a distance beyond the low water mark to the line showing the reserved boat basin. The Cordovanas say, however, that this error is not the crux of their complaint. They earnestly contend that their deed, by its recital, shows that they acquired their lot (No. 5), "together with all riparian rights, waterways, water rights and appurtenances in any wise belonging or appertaining thereto", and that the extension of the *straight* line as decreed by the court deprives them of riparian rights to which they are entitled.

This they assert is true in light of the fact that the decree established that they, together with the Viponds, are the owners of riparian lands, and in view of the map exhibits which plainly show the winding, irregular course of the river. Thus they assert that these circumstances make it manifestly unfair for the court to extend the dividing line "straight" into the waters of the river, effectively destroying their riparian rights.

Section 62-2, Code of Virginia, 1950, reads in part:

"* * * (T)he limits or bounds of the several tracts of land lying on such bays, rivers, creeks and shores, and the rights and privileges of the owners of such lands, shall extend to the low water mark but no farther * * *."

This section is intended to give to every riparian owner the right to the water frontage belonging by nature to his land. Generally this right includes, among others, the right of access to the navigable part of the water course, and also the right to the soil under the water between the riparian owner's land and the navigable line of the water course whereon he may erect wharves or piers for his own use, or the use of the public, subject to such rules and regulations as governing authorities may deem proper to impose for the public's protection. 20 M. J., Waters and Watercourses, § 28, pp. 73-75; 56 Am. Jur., Waters, §§ 273, 277, pp. 726-732.

A riparian owner is entitled, in conformity with these rights, to have the extent of his enjoyment upon the line of navigability of the watercourse determined and marked, and his boundaries defined. The right is based upon the principles of equity and a court of chancery is

the proper tribunal to make the apportionment and to determine the boundaries between coterminous owners.

In the instant case the map exhibits disclose the shore line to be irregular and varying in length from the navigable portion of the river. We said in *Groner* v. *Foster*, 94 Va. 650, 651, 652, 27 S. E. 493, that under such circumstances: "In making the apportionment the prime object, upon plain principles of justice, should be to give to each proprietor of the shore, and as directly in his front as practicable, a parcel of land under the water of a width at its outer end upon the line of navigability proportioned to that which it has at the inner or shore end. *Wonson* v. *Wonson*, 14 Allen 71; and Gould on Waters, secs. 162 and 163.

"It is apparent upon the most cursory reflection that this cannot be attained by a fixed rule of extending out to the line of navigability of the water course the divisional lines between the proprietors of the uplands in the same direction that these lines reach the shore. The frequent curvature, which generally characterizes the form of the shore, forbids its adoption as a rule of division. It would only answer where the line of the shore was straight, the line of navigability equal in length and parallel with it, and the divisional lines approached the shore at right angles. Where the line of the shore or the line of navigability curves, either inwardly or outwardly, or the divisional lines of the uplands approach the shore at different angles, their projection in the same direction out to the line of navigability would necessarily, and unjustly, cause them to encroach upon the riparian rights of the several coterminous proprietors in the water frontage, and deprive some one or more of them of all access to, and benefit of, the navigable part of the water course."

The *Groner* case points up the rule as follows:

"A just rule of division is to measure the length of the shore and ascertain the portion thereof to which each riparian proprietor is entitled; next measure the length of the line of navigability, and give to each proprietor the same proportion of it that he is entitled to of the shore line; and then draw straight lines from the points of division so marked for each proprietor on the line of navigability to the extremities of his lines on the shore. Each proprietor will be entitled to the portion of the line of navigability thus apportioned to him, and also to the portion of the flats, or land under the water, within the lines so drawn from the extremities of his portion of the said line to the extremities of his part of the shore. The general rule of division,

therefore, is, as the whole shore line is to the whole line of navigability so is each one's share of the shore line to each one's share of the line of navigability. The lines so drawn will be parallel, or diverge, or converge, as the navigable water line happens to be equal and parallel with, or is longer, or shorter, than the shore line." (94 Va., at pp. 652, 653; see cases cited at p. 653.)

■ The map exhibits before the court show the lines of that portion of the river surrounding the subdivision reserved as a boat basin, and show lot 6 bordering on the basin. Clearly it was the intention of the proprietors of the subdivision to accord riparian rights to the owners of lots bordering on the river. In fact, the deed conveying lot 5 expressly so states.

We are of the opinion that the trial court erred in extending the dividing line between the lots beyond the low water mark indicated on the maps, and in failing to settle the issues submitted on the pleadings in accordance with the formula quoted above.

For these reasons the decree is reversed and the case remanded for further proceedings not inconsistent with the views here expressed.

*Reversed and remanded.*