# RICHARD SWANENBURG

## V.

# WILLIAM R. BLAND, TRUSTEE OF RIVERHOUSE LAND TRUST, ET AL.

Record No. 900163

November 9, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Lacy, JJ., and Harrison, Retired Justice

*Jimese L. Pendergraft (Harry J. Kostel; Jones, Blechman, Woltz & Kelly*, on brief), for appellants.
*Stephen D. Harris (McGuire, Woods, Battle & Boothe*, on brief), for appellees.

JUSTICE WHITING delivered the opinion of the Court.

In this injunction suit, we consider the riparian rights of three owners of adjoining properties that front upon a navigable river.

In doing so, we examine the peripheral owners' claims that because the middle owner's property does not extend to the mean low-water mark, he has no right to build a pier extending to the line of navigation.

On November 4, 1987, Richard Swanenburg and Margaret W. Swanenburg (collectively Swanenburg) acquired title to Lot 1, Section 2B, of a subdivision known as Chickahominy Haven (the subdivision). William R. Bland, Trustee of Riverhouse Land Trust (Bland), and R. Joseph Lilly own Lots 1 and 2 of Section 4, and Lots 2 and 3 of Section 2B, respectively. The five lots in the subdivision abut and lie generally north of the Chickahominy River in James City County. Swanenburg's lot is between the Bland and Lilly properties.[1]

Swanenburg's lot is approximately triangular, with its sharpest angle cut off by the river. Thus, if projected into the river, Swanenburg's north-south property lines would converge at a specific, undisputed point not far from land (the point of convergence).

The dispute involves the location of the mean low-water mark. If the mean low-water mark is south of the agreed point of convergence, Swanenburg has no statutory riparian rights under Code § 62.1-2.[2] On the other hand, if the mean low-water mark is north of the point of convergence, Swanenburg has those statutory riparian rights. *See Whealton & Wishard* v. *Doughty*, 116 Va. 566, 572, 82 S.E. 94, 96 (1914); Code § 62.1-2. Code § 62.1-2 gives a riparian owner whose property boundaries reach the mean low-water mark "the right of access to the navigable part of the water course, and also the right to the soil under the water between the riparian owner's land and the navigable line of the water course whereon he may erect wharves or piers." *Cordovana* v. *Vipond*, 198 Va. 353, 357, 94 S.E.2d 295, 298 (1956).

Because the riverbank that abuts the parties' properties is concave, the lot frontages on the mean low-water mark and the line of navigation are reduced. Those reduced frontages on the line of navigation are computed in accordance with the formula outlined

---

[1] Attached to this opinion is a sketch showing the relative positions of the lots, the mean low-water mark as contended by Swanenburg, and the mean low-water mark as contended by the defendants.

[2] In pertinent part, Code § 62.1-2 provides: "[T]he limits or bounds of the several tracts of land lying on . . . rivers . . . and the rights and privileges of the owners of such lands, shall extend to the mean low-water mark . . . ."

in the case of *Langley* v. *Meredith*, 237 Va. 55, 63, 376 S.E.2d 519, 523 (1989).[3]

In December 1988, Swanenburg was constructing a pier that would extend beyond the point of convergence to the line of navigation. On December 9, 1988, Bland and Lilly brought this suit to enjoin any construction that would extend beyond the point of convergence. They contended that any pier that extended beyond the point of convergence would encroach upon their properties and violate their riparian rights.

Bland and Lilly later asked that Swanenburg remove five pilings of his pier that were beyond Swanenburg's eastern and western boundaries, which they claimed already encroached upon their properties. The trial court held that two of Swanenburg's pilings encroached upon Lilly's property and that three encroached upon Bland's property. Swanenburg agrees, and our opinion does not affect this holding.

At the first *ore tenus* hearing on July 14, 1989, the parties introduced a number of plats that showed the mean low-water mark opposite Swanenburg's lot. Neither party objected to their admission in evidence.

Bland and Lilly introduced two plats of the subdivision. The plat of section 4 showed that the mean low-water mark was *south* of the point of convergence, and the plat of adjoining Section 2B showed that the mean low-water mark was *north* of that convergence. Bland and Lilly also introduced a plat prepared by Stuart J. Glass, a certified surveyor, which indicated that the mean low-water mark was *south* of the point of convergence. Glass' plat

---

[3] *Langley* quotes the rule as enunciated in *Groner* v. *Foster*, 94 Va. 650, 652-53, 27 S.E. 493, 494 (1897), as:

A just rule of division is to measure the length of the shore and ascertain the portion thereof to which each riparian proprietor is entitled; next measure the length of the line of navigability, and give to each proprietor the same proportion of it that he is entitled to of the shore line; and then draw straight lines from the points of division so marked for each proprietor on the line of navigability to the extremities of his lines on the shore. Each proprietor will be entitled to the portion of the line of navigability thus apportioned to him, and also to the portion of the flats, or land under the water, within the lines so drawn from the extremities of his portion of the said line to the extremities of his part of the shore. The general rule of division, therefore, is, as the whole shore line is to the whole line of navigability so is each one's share of the shore line to each one's share of the line of navigability. The lines so drawn will be parallel, or diverge, or converge, as the navigable water line happens to be equal and parallel with, or is longer, or shorter, than the shore line.

*Langley*, 237 Va. at 63, 376 S.E.2d at 523.

noted that the location of the mean low-water mark was taken from a survey by Thomas W. Savage, Jr., dated July 13, 1978. In rebuttal, Swanenburg introduced a plat by G.T. Wilson, Jr., a certified surveyor, which showed that the mean low-water mark was *north* of the point of convergence, and that Swanenburg had a frontage of 20.3 feet on the mean low mark.

However, none of those plats introduced at the first hearing indicated the method used to determine the location of the mean low-water mark. Nor did any surveyor testify as to how the mean low-water mark was located on the plats.

When the trial court expressed doubt as to the location of the mean low-water mark opposite Swanenburg's lot, Swanenburg was granted time to "do some engineering." Whereupon, Swanenburg employed Paul C. Small, a certified surveyor, to locate the mean low-water mark opposite his lot.

At the second *ore tenus* hearing on October 6, 1989, Small testified that for a period of two weeks in August 1989, he went out at each low tide and put stakes in the ground at four locations on the river side of Swanenburg's lot to indicate the low tide mark on each of these days. Small then took the "measurements of all of the stakes," and calculated and plotted the mean low-water mark on a survey that was introduced as an exhibit. The exhibit showed that the mean low-water mark was *north* of the point of convergence, and that Swanenburg's property had a frontage of 15 linear feet along the mean low-water mark. Small testified that, using the *Langley* formula, he calculated Swanenburg's frontage along the line of navigation to be 12.6 feet.

Glass, a rebuttal witness, testified that Small's method of ascertaining the mean low-water mark was "perfectly in order with the normal procedures in doing a project of this type." However, although he had not attempted to locate the mean low-water mark, Glass impugned the value of Small's measurements by questioning whether the mean low tide would be ascertained accurately by measuring the low tides in August, as Small did.

Glass testified that August usually is, and in this instance was, a time when the low tides were lower than in most other months. Based on his observation of the low tides during the month of August 1989, and his experience in observing low tides as a property owner in the subdivision over a number of previous years, Glass opined that "it is highly likely" that the mean low-water mark would be farther south than as depicted by Small's plat. Glass,

however, did not testify as to the location of the mean low-water mark in relation to the point of convergence, nor did he refer to his plat, which had been introduced in evidence in the first hearing.

Concluding that the mean low-water mark was south of the point of convergence, as shown on the plat that Glass prepared for the first hearing, the trial court enjoined Swanenburg from doing any construction beyond the point of convergence. The court also refused to determine and mark Swanenburg's riparian rights as requested in his written motion. Swanenburg appeals.

Swanenburg contends that the trial court erred in finding that the mean low-water mark was south of the point of convergence. On the other hand, Bland and Lilly contend that the evidence was in conflict on that point, and thus, the trial court's factual finding binds Swanenburg on appeal.

Bland and Lilly would be correct if probative evidence supported the trial court's finding. In this case, however, no such evidence exists. None of the evidence offered by Bland and Lilly indicates how the mean low-water mark was located. If a surveyor does not have a factual basis for his location of a property line, his conclusion regarding its position is not evidence of its location. *Gilbert* v. *Summers*, 240 Va. 155, 159-60, 393 S.E.2d 213, 215 (1990); *Griggs* v. *Brown*, 126 Va. 556, 564, 102 S.E. 212, 214 (1920); *Sutherland* v. *Gent*, 116 Va. 783, 787, 82 S.E. 713, 714 (1914). Furthermore, the admission of such a conclusion without objection cannot give it probative value. *Griggs*, 126 Va. at 564, 102 S.E. at 214. Thus, there was no probative evidence that the mean low-water mark was south of the point of convergence.

The only probative evidence indicating the location of the mean low-water mark was the oral testimony of Small, which was uncontradicted. Small was unimpeached, and his testimony was neither inherently incredible nor inconsistent with the probative evidence in the record. Under these circumstances, the trial court should have found that the mean low-water mark was located north of the point of convergence, as indicated by Small's testimony and survey. Accordingly, the trial court should have found that Swanenburg had a frontage of 12.6 feet on the line of navigation, also as indicated by Small's testimony and survey. *See Haass & Broyles Excavators, Inc.* v. *Ramey Bros. Excavating Co.*, 233 Va. 231, 236, 355 S.E.2d 312, 315 (1987); *Cheatham* v. *Gregory*, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984).

■ The court further erred in failing to determine and mark Swanenburg's riparian rights. If the issue is raised in the pleadings, riparian adversaries are entitled to have the extent of their enjoyment of riparian rights upon the line of navigability determined and marked, the proper share of the flats set apart, and the boundaries defined. *Langley*, 237 Va. at 63, 376 S.E.2d at 523-24. Because Swanenburg raised the issue in his pleadings, the court should have adjudicated those rights.

Accordingly, we will reverse that portion of the judgment which held that Swanenburg had no riparian rights beyond the point of convergence. We will remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*