Present: All the Justices

LESLIE G. CARR, ET AL.

v. Record No. 000475    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        January 12, 2001
ROBERT C. KIDD, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
William F. Rutherford, Judge


This appeal arises from a judgment entered in a suit to determine the riparian rights of neighboring landowners. The primary issue is whether the trial court erred in confirming the report of a commissioner in chancery, which recommended an apportionment of riparian rights based on an approximated historic shoreline existing prior to manmade development of the perimeter of the parties' properties.

The suit initially involved a riparian rights dispute between Robert C. Kidd and Marjorie B. Kidd (collectively, the Kidds), and their immediate neighbors to the northwest, Mark S. Crowley and Lori Crowley (collectively, the Crowleys). The lots owned by the Kidds and Mark Crowley[1] respectively are situated along a cove of Tanner's Creek, a tributary of the Lafayette River in the City of Norfolk. The Kidds sought to build a pier out into the cove from their lot, to which the Crowleys

_____

[1]Mark Crowley is the sole owner of the Crowley lot. His wife Lori was named as a party at the request of Mr. Crowley

objected.  The Kidds commissioned a riparian surveyor, Robert L. Taliaferro, to perform a riparian survey of their lot (the Taliaferro survey) to help resolve the dispute.  The Taliaferro survey indicated that the Kidds were within their riparian rights to build the proposed pier, and that the existing pier used by the Crowleys encroached on the Kidds' riparian rights.

Thereafter, the Kidds filed a bill of complaint against the Crowleys requesting a determination of the parties' respective riparian rights and asserting a cause of action against the Crowleys for trespass based on the location of the existing pier.[2]  After the suit was filed, the Crowleys commissioned their own riparian surveyor, Robert M. Kennedy, to perform a survey (the Kennedy survey) of the Crowley and Kidd lots.  The delineation of riparian rights in the Kennedy survey was nearly identical to that in the Taliaferro survey.[3]

In light of the similarity between the two surveys, the Kidds and the Crowleys reached a tentative settlement that would have required the Crowleys to remove the existing pier but would have ensured that each party had sufficient riparian rights to

_____

based on her interest in the property by reason of her marriage to Mr. Crowley.

[2]The Kidds later filed an amended bill of complaint naming additional parties with a potential interest in the disputed riparian rights.  These additional parties are not involved in this appeal.

2

construct a pier.  The Crowleys' neighbors to the northeast,

Leslie G. Carr and Janice N. Kohl (collectively, the Carrs),

learned of the impending settlement and intervened in the suit

on the ground that the proposed settlement interfered with the

Carrs' riparian rights.  The Carrs further alleged that the

Kennedy survey incorrectly drew riparian lines across a portion

of the Carrs' property, thereby converting a substantial portion

of allegedly non-riparian property into a riparian zone

belonging to Mr. Crowley.

Following the Carrs' intervention, the trial court referred

the matter to a commissioner in chancery, Philip R. Trapani, Jr.

At a hearing before the commissioner, the Kidds and the Crowleys

stipulated to the results of the Kennedy survey.  The Carrs

argued that the Kennedy survey was incorrect, and they requested

a different allocation of the parties' riparian rights.

After the hearing, the commissioner filed a report in which

he recommended that the parties' riparian rights be allocated

based on the Kennedy survey.  The trial court confirmed the

commissioner's report and entered a final order allocating the

parties' riparian rights in accordance with the Kennedy survey.

The record shows that the lots currently owned by the

parties were part of a residential subdivision that originally

---

[3]Attached to this opinion is a diagram adapted from the
Kennedy survey depicting the properties and their respective

3

was platted and recorded in 1903.  The lots now owned by the Carrs (the Carr property) were purchased by their original owner in 1904 from the subdivision developer.[4]  The source deed for the Carr property makes reference to the original subdivision plat of 1903 (original subdivision plat).  The lot now owned by Mr. Crowley (the Crowley property) was purchased by its original owner from the developer in 1910.  The source deed for the Crowley property references a revised subdivision plat recorded in 1908 (revised subdivision plat).  The source deed for the Crowley property is also the source deed for the lot now owned by the Kidds (the Kidd property), which was part of a larger lot originally purchased from the developer in 1910 by one of the Kidds' predecessors in title.[5]

In 1939, a concrete bulkhead was constructed along the northwestern edge of the Carr property.  In addition to the bulkhead, an area of "riprap"[6] was placed along the northeastern edge and corner of the Carr property.  Samples of sand and potash taken from the Kidd property were admitted into evidence

---

riparian allocations.

[4]The Carr property consists of two adjacent lots.  For ease of reference, we will refer to the two lots collectively as "the Carr property."

[5]The larger lot had been subdivided before the Kidds purchased their property in 1994.

[6]The Kidds' expert testified that "riprap" is "[g]enerally stone and concrete and debris of that nature . . . use[d] as backfill and to prevent any more erosion."

at the commissioner's hearing as proof that "fill material" had been placed behind the bulkhead on the Carr property.

The parties stipulated that the applicable rule for apportioning riparian rights is the rule set forth in Groner v. Foster, 94 Va. 650, 27 S.E. 493 (1897). There, the Court stated:

> A just rule of division is to measure the length of the shore and ascertain the portion thereof to which each riparian proprietor is entitled; next measure the length of the line of navigability, and give to each proprietor the same proportion of it that he is entitled to of the shore line; and then draw straight lines from the points of division so marked for each proprietor on the line of navigability to the extremities of his lines on the shore. Each proprietor will be entitled to the portion of the line of navigability thus apportioned to him, and also to the portion of the flats, or land under the water, within the lines so drawn from the extremities of his portion of the said line to the extremities of his part of the shore.

Id. at 652-53, 27 S.E. at 494. Our decision in Groner further indicates that the "shore line" for purposes of applying the above rule is what today is referred to as the mean low water (MLW) line. 94 Va. at 656-58, 27 S.E. at 496.

The parties agreed on the proper methodology for measuring a current MLW line for the purpose of apportioning riparian rights under Groner, and they did not dispute that the Kennedy survey shows the correct current MLW line. The parties also did not dispute that the Kennedy survey shows the correct "edge of water" line in 1939, as taken from a 1939 harbor chart prepared by the United States Army Corps of Engineers Water Department,

5

and that this line is nearly identical to the current MLW line. The parties disagreed, however, whether the current MLW line, or a historic MLW line existing about the time the lots originally were platted and recorded, should be used in making the calculation under Groner.

The parties further disagreed on the proper location of a historic MLW line. The Kidds and the Crowleys argued that the correct MLW line for making the Groner apportionment is a historic MLW line "unaffected by man," namely, a MLW line that existed prior to any manmade development affecting the perimeter of the properties. In determining this historic MLW line in their separate surveys, both Kennedy and Taliaferro relied on the revised subdivision plat. Although a MLW line is not expressly designated on the revised subdivision plat or the original subdivision plat, Taliaferro and Kennedy both concluded that the MLW line of 1908 could be approximated from the information appearing on the revised subdivision plat. Taliaferro testified that this MLW line was an unmarked dotted line on the revised subdivision plat that roughly follows the "straight-line"[7] rear lot boundary lines of the properties, and that he used this dotted line in making his calculation under the Groner rule. Kennedy did not use this dotted line in making

6

his calculation pursuant to Groner but instead used the "straight-line" rear lot boundary lines of the properties, as shown on the revised subdivision plat, which closely resembled the historic MLW line identified by Taliaferro. Kennedy used these rear lot boundary lines based on his determination that they were precise and clearly determined, and were "basically a mathematical tie line" along the actual MLW line of 1908.

The approximate MLW line of 1908, as determined by both the Kennedy and the Taliaferro surveys, is located substantially inland of the current MLW line. An apportionment of the parties' riparian rights under the current MLW line would yield different results from an apportionment under the approximate MLW line of 1908. This disparity would result because the property dimensions set forth in the source deeds and subdivision plats do not extend to the current MLW line, with the exception of the northeastern corner of the Carr property. Thus, based on the dimensions indicated in the deeds and the subdivision plats alone, there is currently an additional portion of land between the rear property line of all the parties' lots as originally platted and deeded and the current MLW line.

_____

[7]We use the term "straight-line" to describe the fixed lines as designated by the original subdivision surveyor and shown on the revised subdivision plat and the Kennedy survey.

The parties agreed that if the Groner rule were applied using the current MLW line, the pie-shaped configuration of the Crowley property would result in its side lot lines converging before reaching the current MLW line. Also, using this method, the side lot lines extending from the Kidd property would nearly converge. Therefore, use of the current MLW line in applying the Groner rule would leave the Crowleys with no riparian rights and the Kidds with substantially reduced rights.

By contrast, the Kennedy survey depicts that in 1908 no additional portion of land existed between the approximate MLW line of 1908 and the back line of the parties' properties as platted and deeded. Since that approximate MLW line was farther inland than the current MLW line, all the parties would have substantial riparian rights if the calculation under Groner were made using the MLW line of 1908.

The Kidds and the Crowleys produced testimony from their expert witnesses that the additional portion of land shown on their surveys exists today because manmade development of the perimeter of the parties' properties has moved the MLW line seaward since the lots originally were platted and recorded. The Kidds and the Crowleys argued that this movement was caused by the placement of the concrete bulkhead and "riprap" on the Carr property, as well as the placement of fill materials along the perimeter of all three properties.

8

The Carrs disagreed with this argument and asserted before the commissioner that the Kidds and the Crowleys improperly relied on the "straight-line" rear lot boundary lines of the revised subdivision plat to approximate the MLW line of 1908. John F. Hill, Jr., a surveyor who qualified as an expert witness, testified that the MLW line of the parties' properties is essentially the same today as when the lots originally were platted and recorded. Based on this testimony, the Carrs contended that the current MLW line is the proper line for purposes of making the calculation under Groner.

Hill based his opinion on a comparison of a "proposed" 1903 U.S. Army Corps of Engineers harbor chart, a 1939 harbor chart prepared by the U.S. Army Corps of Engineers Water Department, and the original subdivision plat. While Hill conceded in his testimony that there had been some movement of the MLW line over the years, he contended that this movement was only "partially caused by development." Hill did not prepare a survey that supported his opinion.

The Carrs also argued that the language in their source deed extended their side lot lines to a MLW line that was virtually the same in 1904 as it is currently. They relied on the language of their source deed stating that the property was conveyed "with all riparian rights on that branch of Tanner's Creek bounding them on the North and West." Thus, the Carrs

argued that the courses and distances set forth in the deed descriptions merely approximated the true rear boundary of their property, which is the MLW line of Tanner's Creek. The Carrs contended that by comparison, the source deed for the Kidd and the Crowley properties did not contain express grants of riparian rights or indicate that the properties were bounded by Tanner's Creek.

In his report, the commissioner concluded that a historic MLW line "*unaffected* by man" is the appropriate MLW line for making the Groner apportionment. The commissioner determined that the "straight-line" rear lot boundary lines shown on the revised subdivision plat, and depicted on the Kennedy survey, best approximated such a MLW line, and that the Kennedy survey's apportionment of riparian rights under the approximated MLW line of 1908 should be adopted. In reaching these conclusions, the commissioner found that Kennedy used a more appropriate methodology that was based on known points, which are fixed and are capable of recertification at any time.

The commissioner was not persuaded by Hill's methodology, observing that testimony from Kennedy and Taliaferro established that the 1903 proposed harbor chart used by Hill was prepared to show navigable water, not land boundaries. Further, Hill conceded on cross-examination that his analysis of the case relied on whether he had accurately located the Carr house on

the 1903 proposed harbor chart. The commissioner noted, first, that Taliaferro testified that the structure identified by Hill was not the Carrs' house but an upstream structure, and second, that Kennedy testified that the house simply was shown on the plat as a general reference point. Moreover, while the commissioner found that Taliaferro and Kennedy had very candid demeanors, the commissioner stated that he was left with the impression that Hill did not believe his own testimony but merely was crafting the best argument for his clients, the Carrs.

The commissioner concluded that there was no merit in the Carrs' argument that the Kidds and Mr. Crowley lacked riparian rights based on the language of the parties' deeds. The commissioner noted that the 1904 source deed for the Carr property describes the property by referring to the lot lines of the original subdivision plat, and refers to the Carr property's dimensions as 150 feet wide by 125 feet deep, fronting on Luxembourg Avenue to the west.

The commissioner observed that the language of this source deed states that the Carr property includes "all riparian rights" extending into Tanner's Creek from the southwest corner of the property by a line of North 16 degrees West "as shown by a dotted line of the plat above referred to." The commissioner concluded that this deed language designates this riparian line

11

to run from the platted pin placed 125 feet from Luxembourg Avenue at the southwest corner of the Carr property. The commissioner stated that this conclusion is evident from the original subdivision plat, which shows dotted lines extending out from the corners of the three properties of the parties, and described these dotted lines as "strikingly similar in orientation to the riparian lines on the Kennedy survey."

The commissioner noted that although the current deeds for the Kidd and the Crowley properties have quitclaim provisions regarding the properties' respective riparian rights, no riparian rights have been severed by deed from these properties. The commissioner finally concluded that an apportionment based on the Kennedy survey better meets "plain principles of justice" because such an apportionment gives all the property owners in this case rights to the shore and the flats directly in front of their properties. The trial court entered a final order apportioning the parties' riparian rights in accordance with the commissioner's recommendations.

We consider the Carrs' assignments of error on appeal under an established standard of review. A trial court's order approving a commissioner's report will be affirmed unless it is plainly wrong or without evidence to support it. Chesapeake Builders, Inc. v. Lee, 254 Va. 294, 299, 492 S.E.2d 141, 144 (1997); Firebaugh v. Hanback, 247 Va. 519, 525, 443 S.E.2d 134,

12

137 (1994).  We accord "great weight" to the factual findings of the commissioner that have been confirmed by the trial court and, thus, it is not our role to assess either the credibility of the witnesses or the probative value to be given to their testimony.  Cooper v. Cooper, 249 Va. 511, 518, 457 S.E.2d 88, 92 (1995).

On appeal, the Carrs first argue that the commissioner's use of the approximate MLW line of 1908, rather than the current MLW line, violated the Groner rule.  They contend that the commissioner improperly assumed that the historic MLW line had changed because the Carrs' predecessors in title had placed fill materials and a bulkhead on the property.

The Carrs also assert that since their bulkhead lawfully was constructed in 1939 inland of the then existing MLW line, the commissioner erred in making his calculations under the Groner rule based on the approximate MLW line of 1908.  They contend that the Kennedy survey adopted by the commissioner is further contrary to the Groner rule because the survey allocates within Mr. Crowley's riparian zone 639 square feet of the Carrs' "dry" land.  We disagree with the Carrs' arguments.

In addressing these arguments, we first observe that the law governing the allocation of riparian rights is clear.  A riparian owner has a right to the water frontage that belongs by nature to his land.  This right includes, among other things,

13

the right to the soil under the water between his land and the navigable line of the watercourse. The riparian owner may erect on this soil wharves, piers, or bulkheads for his own use, or for public use, subject to such rules as the General Assembly may impose for the public's protection. Langley v. Meredith, 237 Va. 55, 62, 376 S.E.2d 519, 523 (1989); Cordovana v. Vipond, 198 Va. 353, 357, 94 S.E.2d 295, 298 (1956); Groner, 94 Va. at 651, 27 S.E. at 494. The enjoyment of this right is limited by statute such that exercise of the right shall not result in an obstruction of navigation or in injury to another's private rights. See Code § 62.1-164.

In conformance with these principles, a riparian owner is entitled to have the extent of his rights on the line of navigability of the water course determined and marked, along with his proper share of the flats, or land under the water, and those boundaries defined. Langley, 237 Va. at 62, 376 S.E.2d at 523; Groner, 94 Va. at 651-52, 27 S.E. at 494. The prime object of this apportionment "should be to give each proprietor of the shore, and as directly in his front as practicable, a parcel of land under the water of a width at its outer end upon the line of navigability proportioned to that which it has at the inner or shore end." Langley, 237 Va. at 62, 376 S.E.2d at 523 (quoting Groner, 94 Va. at 652, 27 S.E. at 494).

14

Frequent incidences of shore curvature prevent apportionment of riparian rights under a fixed rule extending out to the line of navigability the divisional lines between the owners' properties in the same direction that these lines reach the shore.  Langley, 237 Va. at 62, 376 S.E.2d at 523; Groner, 94 Va. at 652, 27 S.E. at 494.  If the shore line or the line of navigability curves, or the divisional property lines approach the shore at different angles, projection of these lines in the same direction out to the line of navigability would necessarily and unjustly cause an encroachment on the riparian rights of the several adjoining waterfront owners, and deprive one or more of those owners of all access to the navigable part of the watercourse.  Langley, 237 Va. at 62-63, 376 S.E.2d at 523; Groner, 94 Va. at 652, 27 S.E. at 494.  To account for these potential problems, we articulated the rule in Groner, which we set forth above.

As these principles governing riparian rights make clear, a riparian owner's rights are limited by the water frontage belonging by nature to his land.  Langley, 237 Va. at 62, 376 S.E.2d at 523; Cordovana, 198 Va. at 357, 94 S.E.2d at 298; Groner, 94 Va. at 651, 27 S.E. at 494.  Thus, a riparian owner gains the benefit of any accretion[8] of his property from gradual

---

[8]"Accretion" is a broad term referring generally to any change in land that is caused by the force of water and that

15

and imperceptible changes caused by natural forces.  Steelman v. Field, 142 Va. 383, 387, 128 S.E. 558, 559 (1925).  However, a riparian owner may not, by means of lawful development of his land, enlarge his riparian rights and advance the division line between his riparian zone and the riparian zone of other property owners, or otherwise restrict the riparian rights of such other property owners.  Lambert's Point Co. v. Norfolk and W. Ry. Co., 113 Va. 270, 274, 74 S.E. 156, 158 (1912); see Shepheard v. Boggs, 198 Va. 299, 305, 94 S.E.2d 300, 304 (1956).

This rule articulated in Lambert's Point is particularly instructive here.  The parties in that case sought an apportionment of riparian rights under circumstances in which the shoreline of their adjoining properties was irregular and curved.  113 Va. at 271, 74 S.E. at 157.  On the waterfront of a portion of its land, one party lawfully had "filled in" land and built wharves, and sought to have its riparian rights determined in accordance with the altered shoreline resulting from the "filled in" land.  113 Va. at 273-74, 74 S.E. at 158.  The commissioner in chancery to whom the suit was referred apportioned the parties' riparian rights by determining the MLW line "as if the filling in had not been done."  113 Va. at 274, 74 S.E. at 158.

---

involves an addition to land.  Lynda Lee Butler & Margit Livingston, Virginia Tidal and Coastal Law § 3.4, at 62-63

16

We approved the methodology of the commissioner and his conclusion that an owner's riparian rights cannot be increased by that owner's lawful development of its shoreline. Id. We quoted with approval the commissioner's explanation that under a contrary view, "it would lie in the power of one riparian owner, by its own voluntary act, which could not be prevented by the adjoining owner, to increase its riparian rights, and encroach upon the riparian rights of the other adjoining owner to any extent." Id. Thus, when a property's perimeter has been developed, thereby altering the property's shoreline, an apportionment of riparian rights under the Groner rule requires that those rights be determined as if the perimeter improvements, including the placement of fill materials, had not been made. Id.

In the present case, the commissioner accepted the testimony of Kennedy and Taliaferro that the Carrs' shoreline had been altered due to the manmade development of the perimeter of the property. Both experts testified that there were fill materials behind the bulkhead and the riprap on the Carrs' property. Taliaferro stated that these fill materials created "an enormous increase in land" behind the bulkhead on the Carr property, and he identified the fill materials as including

(1988).

17

heavy grain sands, rock, stone, and fly ash, which are materials "not natural to that area."

In addition, the bulkhead on the Carr property was constructed about 38 feet seaward of the 125-foot southern lot line terminus designated in the Carrs' source deed. Taliaferro concluded that the portion of the Carr property extending to the water beyond its 125-foot southern side lot line consisted entirely of fill materials.

Kennedy also testified that the difference between the current shoreline of all the parties' properties and their shoreline shown on the revised subdivision plat of 1908 is largely the result of manmade development. In addition, Hill, the Carrs' expert, conceded on cross-examination that the Carrs' shoreline had moved to some degree partly based on the manmade development of the property. Based on this evidence of manmade development, we conclude that the commissioner properly disregarded the current MLW line for purposes of making his apportionment under the Groner rule.

We next conclude that the evidence supports the commissioner's use of the approximate MLW line of 1908, as reflected by the "straight-line" rear lot boundary lines shown on the Kennedy survey. This methodology is supported by the expert testimony of Kennedy and Taliaferro. The approach also is consistent with Code § 28.2-1202 which provides, in material

18

part, that the boundaries of tracts of land lying on the bays, rivers, creeks, and shores within the jurisdiction of the Commonwealth, and the rights and privileges of the owners of such lands, generally extend to the mean low-water mark "but no farther." Id.

Kennedy testified that he approximated the MLW line of 1908 after examining both the original and the revised subdivision plats. He stated that he identified this approximate MLW line based on his 16-year expertise in preparing hydrographic and riparian surveys, and that he followed proper surveying procedures for determining riparian rights, including disregarding changes in property boundaries caused by manmade development. Taliaferro confirmed that Kennedy used proper surveying procedures, and identified an approximate MLW line of 1908 that closely resembled the course of the historic MLW line identified by Kennedy.

We find no merit in the Carrs' assertion that the method of locating this historic MLW line violated the requirement of Swanenburg v. Bland, 240 Va. 408, 413, 397 S.E.2d 859, 862 (1990), that a surveyor's conclusion regarding the location of a property line rest on a factual basis. In Swanenburg, we reversed a judgment that was based on a surveyor's opinion regarding the location of a MLW line because his testimony was not supported by any probative evidence. Id. In contrast, the

19

historic MLW line adopted by the commissioner in the present case was supported by evidence that this MLW line could be approximated based on the shoreline as shown on the original and revised subdivision plats.

We next consider the Carrs' contention that the trial court erred in adopting the commissioner's conclusion that the southern lot line of their property did not extend to "existing mean low water." The Carrs' objection to the commissioner's conclusion is based on their assertion that they own a triangular-shaped piece of about 639 square feet of land that they would lose to Mr. Crowley under the commissioner's recommended allocation of riparian rights. The Carrs note that their property was conveyed pursuant to the original 1904 subdivision plat, and that their deed description did not provide for a rear property line but stated only that Tanner's Creek bounded the rear of the property. They contend that this natural boundary description takes precedence over measurements in the deed, such as the description of the property as "running between [125-foot] parallel lines."

We conclude that the commissioner's finding is not plainly wrong and is supported by evidence in the record, including the testimony of Leslie Carr. Carr admitted on cross-examination that the survey he obtained when he purchased the property showed that the disputed triangle of land lying to the southwest

of his bulkhead was outside his platted lot lines.  Moreover, the Kennedy survey adopted by the commissioner placed that triangle of land within the riparian zone for the Crowley property based on Kennedy's location of the approximate MLW line of 1908 along the rear lot lines fixed in the revised subdivision plat.  Thus, the commissioner properly accepted the conclusion of Kennedy and Taliaferro that the Carr property did not include the disputed triangle of land.

The Carrs next argue that the trial court erred in affirming the commissioner's determination that the language of the source deed for the Kidd and Crowley properties did not "estop" the Kidds and the Crowleys from asserting riparian rights.  The Carrs note that the source deed for both properties did not contain an express grant of riparian rights and did not state that the rear boundary lines of those properties was Tanner's Creek.  The Carrs also contend that the commissioner failed to address adequately the issues raised by the quitclaim provisions in the deeds of the Kidd and the Crowley properties. We disagree with the Carrs' arguments.

Although the source deed for the Kidd and Crowley properties did not contain an express grant of riparian rights, the deed describes the boundaries of those lots in part by reference to the revised subdivision plat, which depicts the properties as having a rear waterfront boundary.  Moreover, the

source deed for the Kidd and Crowley properties did not have a quitclaim provision. The record before us shows that a quitclaim provision appeared in the chain of title for the Kidd property in 1993, and in the chain of title for the Crowley property in 1985.

A riparian owner has the right to water frontage belonging by nature to his land, unless that right has been clearly and manifestly retained by the grantor in language appearing on the face of the deed. Irby v. Roberts, 256 Va. 324, 330, 504 S.E.2d 841, 844 (1998); Thurston v. City of Portsmouth, 205 Va. 909, 913, 140 S.E.2d 678, 681 (1965). Here, the chain of title to both the Kidd and the Crowley properties shows no such retention or severance of riparian rights. Thus, the commissioner properly concluded that the language of the Kidd and the Crowley deeds did not preclude them from asserting riparian rights in their waterfront properties.[9]

For these reasons, we will affirm the trial court's judgment.

Affirmed.

_____

[9]We have considered the remaining arguments advanced by the Carrs in support of their assignments of error and conclude that those arguments have no merit.

22



TANNER'S CREEK

KIDD

CROWLEY

CARR

CARR

VENDOME PLACE

LUXEMBOURG AVE.

"STRAIGHT-LINE" REAR LOT BOUNDARY LINES
AS SHOWN ON THE REVISED SUBDIVISION PLAT DATED 1908

APPROXIMATE CURRENT MLW LINE

RIPARIAN LINES

CONCRETE BULKHEAD

RIP-RAP

EDGE OF WATER LINE
AS SHOWN ON A HARBOR CHART DATED 1936 PREPARED BY
THE U.S. ARMY CORPS OF ENGINEERS WATER DEPARTMENT

UNDEFINED DOTTED LINE
AS SHOWN ON THE REVISED SUBDIVISION PLAT DATED 1908

LEGEND

639 SQ. FT. OF DISPUTED AREA